IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REICH & TANG DEPOSIT SOLUTIONS, LLC and REICH & TANG DEPOSIT NETWORKS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. _____ **JURY TRIAL DEMANDED** |
| ISLAND INTELLECTUAL PROPERTY LLC and DOUBLE ROCK CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiffs Reich & Tang Deposit Solutions, LLC and Reich & Tang Deposit Networks, LLC (collectively, "Plaintiffs" or "Reich & Tang"), by and through their attorneys, hereby allege as follows:

1.    Through this and related actions filed concurrently herewith, Plaintiffs seek declaratory judgment that patents relating to fundamental cash accounting techniques that Plaintiffs licensed prior to the Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l et al.*, 134 S.Ct. 2347 (2014) are invalid.  Under the license to these patents, Plaintiffs paid millions of dollars in royalties to Island Intellectual Property LLC ("Island IP") and Double Rock Corporation ("Double Rock") (collectively, "Defendants").

2.    After the Supreme Court's decision in *Alice*, Plaintiffs explained to Defendants that the licensed accounting patents were directed to patent ineligible subject matter.  Consistent with the Supreme Court's direction in *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) and its progeny, Plaintiffs repudiated their obligations under the license, informed Defendants this was due to the invalidity of the licensed patents, and ceased paying royalties.

3.      In response, Defendants filed a civil action in New York state court asserting, *inter alia*, that Plaintiffs must continue to pay royalties until every licensed patent either expires or is declared invalid by judicial decree.  Thus, the threat of suit by Defendants is real and not idle.

4.      By this and related actions, Plaintiffs seek a declaration that all of the licensed patents are invalid.  In this complaint, Plaintiffs seek relief with respect to the following licensed patents:  (1) U.S. Patent No. 7,668,771 ("the '771 patent"); (2) U.S. Patent No. 7,672,901 ("the '901 patent"); (3) U.S. Patent No. 7,680,716 ("the '716 patent"); (4) U.S. Patent No. 8,019,668 ("the '668 patent"); (5) U.S. Patent No. 8,239,321 ("the '321 patent"); (6) U.S. Patent No. 8,386,382 ("the '382 patent"); (7) U.S. Patent No. 8,571,960 ("the '960 patent"); (8) U.S. Patent No. 8,606,676 ("the '676 patent"); and (9) U.S. Patent No. 8,655,689 ("the '689 patent") (collectively, the "patents-in-suit").[1]

5.      A number of exhibits are attached to this complaint and incorporated herein. Those exhibits are listed below:

6.      Attached hereto as Exhibit 1 is a true and correct copy of the '771 patent.

7.      Attached hereto as Exhibit 2 is a true and correct copy of the '901 patent.

8.      Attached hereto as Exhibit 3 is a true and correct copy of the '716 patent.

9.      Attached hereto as Exhibit 4 is a true and correct copy of the '668 patent.

10.     Attached hereto as Exhibit 5 is a true and correct copy of the '321 patent.

11.     Attached hereto as Exhibit 6 is a true and correct copy of the '382 patent.

12.     Attached hereto as Exhibit 7 is a true and correct copy of the '960 patent.

13.     Attached hereto as Exhibit 8 is a true and correct copy of the '676 patent.

---

[1]      The licensed portfolio (the "Portfolio") includes 58 patents in total.  Although the subject matter is similar, given the volume of patents and Defendants' assertion that every patent must be declared invalid to fully extinguish Plaintiffs' royalty obligations, Plaintiffs have divided their challenges to the 58 patents across several, related complaints.  Nine of the patents are challenged in this complaint.

14.     Attached hereto as Exhibit 9 is a true and correct copy of the '689 patent.

15.     Attached hereto as Exhibit 10 is a true and correct copy of *The Reserve Fund saga, continued: Take a look at Bent family's rocky new venture*, CRAIN'S NEW YORK BUSINESS, Dec. 12, 2010, http://www.crainsnewyork.com/article/20101212/sub/312129970/the-reserve-fund-saga-continued-take-a-look-at-bent-familys-rocky-new-venture.

16.     Attached hereto as Exhibit 11 is a true and correct copy of Aaron Elstein, *Oh, those unbending Bents*, Crain's New York Business, Sept. 12, 2010, http://www.crainsnewyork.com/article/20100912/SUB/309129973/oh-those-unbending-bents.

17.     Attached hereto as Exhibit 12 is a true and correct copy of Gregory J. Maier et al., *Patent Protection Provides Long-term Net Strategy*, 22 Nat'l L. J. B11 (Oct. 1999), http://www.oblon.com/bradley-d-lytle/publications/patent-protection-provides-long-term-net-strategy/.

18.     Attached hereto as Exhibit 13 is a true and correct copy of an Email from Michael P. Lydon to Bruce Bent II, dated May 7, 2015.

19.     Attached hereto as Exhibit 14 is a true and correct copy of an Amended License Agreement between Island Intellectual Property, LLC and Reich & Tang Deposit Solutions, LLC, dated January 3, 2011.

20.     Attached hereto as Exhibit 15 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '129 patent, dated July 23, 2003.

21.     Attached hereto as Exhibit 16 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '129 patent, dated June 22, 2007.

22.     Attached hereto as Exhibit 17 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '771 patent, dated July 8, 2009.

23.     Attached hereto as Exhibit 18 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '129 patent, dated March 19, 2004.

24.     Attached hereto as Exhibit 19 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '939 patent, dated April 18, 2012.

25.     Attached hereto as Exhibit 20 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '107 patent, dated November 20, 2008.

26.     Attached hereto as Exhibit 21 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '107 patent, dated July 31, 2009.

27.     Attached hereto as Exhibit 22 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '771 patent, dated November 21, 2008.

28.     Attached hereto as Exhibit 23 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '901 patent, dated November 21, 2008.

29.     Attached hereto as Exhibit 24 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '901 patent, dated August 21, 2009.

30.     Attached hereto as Exhibit 25 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '902 patent, dated November 21, 2008.

31.     Attached hereto as Exhibit 26 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '860 patent, dated April 2, 2012.

32.     Attached hereto as Exhibit 27 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '668 patent, dated November 9, 2010.

33.     Attached hereto as Exhibit 28 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '962 patent, dated October 15, 2010.

34.     Attached hereto as Exhibit 29 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '985 patent, dated January 22, 2010.

35.     Attached hereto as Exhibit 30 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '985 patent, dated March 3, 2010.

36.     Attached hereto as Exhibit 31 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '985 patent, dated November 23, 2011.

37.     Attached hereto as Exhibit 32 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '859 patent, dated January 22, 2010.

38.     Attached hereto as Exhibit 33 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '860 patent, dated November 15, 2011.

39.     Attached hereto as Exhibit 34 is a true and correct copy of an Applicant Office Action Response filed during the prosecution of the '667 patent, dated June 4, 2010.

40.     Attached hereto as Exhibit 35 is a true and correct copy of Opinion Letter issued by the Securities and Exchange Commission, 1975 SEC No-Act. LEXIS 154 (Jan. 26, 1975).

41.     Attached hereto as Exhibit 36 is a true and correct copy of Opinion Letter issued by the Securities and Exchange Commission, 1985-SEC No-Act. LEXIS 1593 (Jan. 8, 1985).

42.     Attached hereto as Exhibit 37 is a true and correct copy of Interpretation Letter No. 88-56 issued by the Federal Deposit Insurance Corporation, *Insurance Coverage of Book-Entry Deposits in a Multi-Bank Depository Program*, FDIC-88-56, 1988 FDIC Interp. Ltr. LEXIS 57 (Aug. 31, 1988).

43.     Attached hereto as Exhibit 38 is a true and correct copy of Interpretation Letter No. 89-19 issued by the Federal Deposit Insurance Corporation, *Custodial Accounts Held by X Corporation on Behalf of Banks and Other Customers*, FDIC-89-19, 1989 FDIC Interp. Ltr. LEXIS 20 (June 19, 1989).

44.     Attached hereto as Exhibit 39 is a true and correct copy of Interpretation Letter No. 90-34 issued by the Federal Deposit Insurance Corporation, *Selling Participations in "Negotiable" Certificates of Deposit: Recordkeeping Requirements*, FDIC-90-34, 1990 FDIC Interp. Ltr. LEXIS 33 (Aug. 9, 1990).

45.     Attached hereto as Exhibit 40 is a true and correct copy of Interpretation Letter No. 94-18 issued by the Federal Deposit Insurance Corporation, *Deposit Insurance for Equal "Participations" in a Negotiable Certificate of Deposit*, FDIC-94-18, 1994 FDIC Interp. Ltr. LEXIS 56 (Apr. 1, 1994).

46.     Attached hereto as Exhibit 41 is a true and correct copy of an Interpretation Letter issued by the Federal Reserve Board of Governors, 1983 Fed. Res. Interp. Ltr. LEXIS 88, at 3 (June 22, 1983).

47.     Attached hereto as Exhibit 42 is a true and correct copy of an Interpretation Letter issued by the Federal Reserve Board of Governors, *Board of Governors of the Federal Reserve System*, 1984 Fed. Res. Interp. Ltr. LEXIS 56 (Nov. 16, 1984).

48.     Attached hereto as Exhibit 43 is a true and correct copy of Interpretation Letter No. 86-15 issued by the Federal Deposit Insurance Corporation, *Insurance Coverage of Packaged Affiliate Certificate of Deposit Program*, FDIC-86-15, 1986 FDIC Interp. Ltr. LEXIS 15 (May 22, 1986).

49.     Attached hereto as Exhibit 44 is a true and correct copy of Interpretation Letter No. 86-21 issued by the Federal Deposit Insurance Corporation, *Insurance of Deposits Placed in Several Banks in a Bank Holding Company System*, FDIC-86-21, 1986 FDIC Interp. Ltr. LEXIS 21 (July 23, 1986).

50.     Attached hereto as Exhibit 45 is a true and correct copy of Interpretation Letter No. 86-22 issued by the Federal Deposit Insurance Corporation, *Insurance of Deposits Placed in Several Affiliated Banks*, FDIC-86-22, 1986 FDIC Interp. Ltr. LEXIS 22 (Aug. 11, 1986).

51.     Attached hereto as Exhibit 46 is a true and correct copy of Interpretation Letter No. 86-23 issued by the Federal Deposit Insurance Corporation, *Insurance of Deposits Placed in Several Affiliated Banks*, FDIC-86-23, 1986 FDIC Interp. Ltr. LEXIS 23 (Aug. 15, 1986).

52.     Attached hereto as Exhibit 47 is a true and correct copy of Interpretation Letter No. 86-31 issued by the Federal Deposit Insurance Corporation, *Insurance Coverage of Book-Entry Deposits in a Multi-Bank Depository Program*, FDIC-86-31, 1986 FDIC Interp. Ltr. LEXIS 33 (Oct. 20, 1986).

53.     Attached hereto as Exhibit 48 is a true and correct copy of an Interpretation Letter issued by the Federal Reserve Board of Governors, *Board of Governors of the Federal Reserve System*, 1994 Fed. Res. Interp. Ltr. Lexis 156 (June 24, 1994).

## I.    PARTIES

54.    Plaintiff Reich & Tang Deposit Networks, LLC is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business in New York, New York.  Reich & Tang Asset Management, LLC, was a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business in New York, New York.  On December 31, 2015, Reich & Tang Asset Management, LLC merged into Reich & Tang Deposit Networks, LLC.

55.    Plaintiff Reich & Tang Deposit Solutions, LLC is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business in New York, New York.  Reich & Tang Deposit Solutions, LLC is a wholly-owned subsidiary of Reich & Tang Deposit Networks, LLC.

56.    Reich & Tang is an industry leader in providing deposit, liquidity, and cash management solutions for banks, broker-dealers, investment advisors, institutional investors, and public entities.

57.    Defendant Island IP has alleged that it is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business in the State of New York.  Upon information and belief, Island IP holds and manages patents and other intellectual property for its corporate parent, Double Rock, and other affiliated entities.  Island IP has previously asserted patents in the Portfolio in the District of Delaware.  See, e.g., Island Intellectual Property LLC v. First Southwest Co., C.A. No. 11-371 (RGA) (Apr. 6, 2011).

58.    Defendant Double Rock has alleged that it is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in the State of New York.

59.    Upon information and belief, Defendant Double Rock is the successor to Reserve Management Company ("Reserve").

60.     Upon information and belief, Bruce R. Bent and Bruce Bent II (collectively "the Bents"), named inventors on the patents in suit, are principals of Double Rock and Island IP and were principals of Reserve.

61.     Reserve reportedly changed its name to Double Rock following difficulties in connection with its flagship fund.  As reported by Crain's, the Bents and Reserve "had seen their reputation trashed in September 2008 when their flagship $62 billion fund 'broke the buck,' triggering a full-scale global financial panic.  Adding insult to injury, the Securities and Exchange Commission sued the Bents and their company, Reserve Management, alleging they had withheld key information from customers and board members during the darkest moments of the financial crisis."  Ex. 10.

62.     Concerning the events surrounding Reserve's name-change to Double Rock, Crain's further reported:

> The Bents, as students of the 2008 financial crisis will recall, ran an enormous $62 billion money-market fund called the Reserve Primary Fund, which "broke the buck" after Lehman Brothers filed for bankruptcy. The fund's net asset value fell below the sacrosanct $1 a share because it held $785 million of Lehman debt that immediately had to be written down to zero.  That is never supposed to happen at an ultra-secure money-market fund, so a full-scale panic was triggered throughout the financial world, forcing the U.S. government to guarantee all of the $3.7 trillion parked in money-market funds.

> Way to go, Bents! In May 2009, the Securities and Exchange Commission sued Reserve Management Co.'s chief executive, Bruce Bent, and his son, President Bruce Bent II, alleging that they hid key information from customers and board members in the hours after the Lehman bankruptcy to stem a flood of redemptions (see "Inside the panic at Reserve Fund," May 11, 2009).

> * * *

> As their legal costs pile up, the Bents are asking Reserve—whose name was changed to Double Rock Corp. after the buck-breaking debacle—to help pay their bills.  The Bents claim that they are owed $32.5 million in unpaid fund-management fees accrued since September 2008 and seek another $13 million from their company to help cover legal costs.

Ex. 11.

63.    Upon information and belief, Bruce Bent Sr. holds an undergraduate degree in economics and Bruce Bent II holds an undergraduate degree in philosophy.  Upon information and belief, the Bents have no additional college or university degrees.

64.    On July 23, 1998, the U.S. Court of Appeals for the Federal Circuit issued its decision in *State Street Bank & Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), which was understood as leading to a "virtual boom in patent application filings for business method patents."  Ex. 12.  Following *State Street*, the Bents began applying for patents on a cash accounting concept relating to FDIC insurance limits, eventually obtaining at least 58 such patents.

## II.    JURISDICTION AND VENUE

65.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, and 2201 because this action arises under the patent laws and seeks relief under the Federal Declaratory Judgment Act.

66.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because, among other reasons, Defendants:  are subject to personal jurisdiction in this judicial district; are organized and existing under the laws of the State of Delaware; have previously availed themselves of this venue in prior lawsuits; and/or conduct or have regularly conducted business in this judicial district by operating subsidiaries organized and existing under the laws of the State of Delaware.

## III.    FACTUAL BACKGROUND

### A.    Reich & Tang's history before its dealings with Defendants.

67.    Since 1975, Reich & Tang has been in the business of providing "cash sweep" and other cash management services to financial intermediaries and their underlying customers. Such services include "sweeping" cash balances into or out of accounts or funds, such as money

market mutual funds managed by Reich & Tang, on a daily basis to maximize return on what would otherwise be idle holdings, while providing checking, debit card, and ACH services.

68.     In 2007, Reich & Tang began providing FDIC-insured cash sweep services in which customer's cash balances are regularly swept into accounts at one or more banks in amounts not exceeding the $250,000 limit on FDIC insurance in any one bank.  At that time, Reich & Tang provided its FDIC-insured cash sweep services through an arrangement with Promontory Interfinancial Network, LLC, which performed back-office administrative functions for Reich & Tang.

69.     In 2009, Reich & Tang largely had the necessary infrastructure in place to bring all the management of its FDIC-insured sweep program in-house and its arrangement with Promontory no longer suited its needs.

**B.      The parties' initial dealings.**

70.     As it prepared to transition all of its FDIC-insured sweep functions in-house, Reich & Tang moved on from Promontory and, on October 8, 2009, hired Double Rock to temporarily provide support for aspects of Reich & Tang's sweep business through a contractor agreement and entered a patent license agreement with Island IP, which by then had obtained a number of cash-management accounting patents following *State Street Bank*.  Reich & Tang paid Double Rock and Island IP under these agreements.

71.     Under the October 9, 2009 agreements, once the term of the contractor agreement ended and Reich & Tang brought all its FDIC-insured sweep activities in-house, payments to Defendants would decline significantly and be limited to patent license royalties.

72.     In 2010, Reich & Tang was on the verge of absorbing internally the support functions that Double Rock was performing under the contractor agreement.

73.     In 2010, Double Rock was willing to sell its FDIC-insured sweep business (called LIDs).  Double Rock failed to obtain another significant customer and stood to see its revenues decrease dramatically if Reich & Tang took its operations in-house.

74.     Reich & Tang was willing to acquire Double Rock's LIDs FDIC-insured sweep business, as it included certain client relationships that were strategic for Reich & Tang.  Double Rock desired for any transaction to also include two of its other businesses.

75.     Reich & Tang retained Ernst & Young to perform an independent valuation of the Double Rock businesses.  Reich & Tang offered to purchase the businesses for $15 million, which reflected the Ernst & Young valuation along with an addition for goodwill.

76.     Reich & Tang explained that it was attributing this amount to the LIDs FDIC-insured sweep business, as one of the two other businesses was about to be impacted by regulatory changes and the other was not yet a viable business operation.

77.     Double Rock accepted the offer and, on December 22, 2010, Reich & Tang Deposit Solutions and Double Rock entered into an Asset Purchase Agreement for the three businesses.  Reich & Tang paid Double Rock $15 million under this agreement.

78.     On January 3, 2011, Reich & Tang and Island IP entered an Amended License Agreement, licensing Island IP's patent portfolio to Reich & Tang and setting royalty terms for each of the three businesses.  For years, Reich & Tang paid Island IP millions of dollars in royalties under the Amended License Agreement.

79.     At no point when Plaintiffs and Defendants entered into any of the agreements was any litigation or other lawsuit pending between them.  None of the agreements purports to settle, or even references, any lawsuit.  Neither Island IP nor Double Rock has ever brought an action for patent infringement against Reich & Tang.

80.     Neither the 2011 Amended License Agreement nor the initial 2009 Licensing Agreement is a settlement agreement.

## C.     The present dispute.

81.     In 2014, the Supreme Court issued its landmark decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l et al.*, wherein the Court held, among other things, that a "mere instruction to

implemen[t]" an abstract idea "on . . . a computer . . . cannot impart patent eligibility" under 35 U.S.C. § 101.  134 S.Ct. 2347, 2358 (2014).

82.     With the Supreme Court's decision in *Alice*, it was clear that Island IP had received millions of dollars in royalty payments from Reich & Tang under a portfolio of patents that were directed to unpatentable subject matter under 35 U.S.C. § 101.  Subsequent decisions have recognized that business method patents, invalid under *Alice*, served as tools for mischief by patentees before the Supreme Court's decision.  *See, e.g., Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring).

83.     As Defendants acknowledged in their state court complaint, in early May 2015, Reich & Tang notified Defendants that it was repudiating its obligations under the Amended License Agreement because the licensed patents were invalid under Supreme Court precedent. *C.f.,* Ex. 13.  Thereafter, Reich & Tang ceased making royalty payments.

84.     On June 23, 2015, Island IP and Double Rock sued Reich & Tang Deposit Solutions, LLC, Reich & Tang Asset Management, LLC, and Michael Lydon in the Supreme Court of the State of New York, alleging breach of contract, indemnification, and fraudulent inducement, and seeking relief in the form of specific performance and monetary damages. *Island Intellectual Property LLC and Double Rock Corp. v. Reich & Tang Deposit Solutions LLC et al.*, Index No. 651702-2015, ¶ 38 (Sup. Ct. N.Y. Cty. Jun. 23, 2015) ("Island IP State Court Case").

85.     In their state court complaint, Island IP and Double Rock have asserted that Reich & Tang must continue to make royalty payments under the Amended License Agreement until "all of the Licensed Patents expire, are abandoned, nullified or become subject to a final, unappealable Order invalidating all such Licensed Patents." *Island IP State Court Case*, ¶ 38 (citing Ex. 14 at Section 6.1).  At the same time, Island IP and Double Rock have contended that there should be no judicial determination in that action with respect to the issue of patent invalidity and that Plaintiffs are prohibited from challenging the validity of the licensed patents under the terms of the Amended License Agreement.

86.     The state court action is in its initial stages and Reich & Tang has not yet answered the complaint.

87.     By this complaint and the related actions filed concurrently herewith, Plaintiffs seek a declaration that the licensed patents are invalid, a question which bears directly on the parties' rights and obligations concerning any royalties.

**D.     Banking regulations addressed by the licensed patents.**

88.     Island IP's patent portfolio is generally addressed to strategies for managing bank accounts to take advantage of certain federal banking laws and regulations.

89.     One such regulation governs limits on FDIC insurance.   The FDIC insures individuals' deposits held in a covered bank to protect such deposits from the failure of that bank.  Such insurance is subject to a maximum amount for an individual at a given institution. From 1980 to 2008 this maximum was $100,000 and was raised to $250,000 in 2008.  Thus, an individual's deposits adding up to a balance of $250,000 at a given bank are insured by the FDIC, but any amounts above a balance of $250,000 are not insured against failure of the bank. However, because FDIC insurance protects against the failure of particular banks, an individual may deposit funds at any number of those banks and enjoy FDIC insurance protection up to the $250,000 limit at each bank.   Thus, if an individual deposits $500,000 in one bank, only $250,000 will be insured by the FDIC.   In contrast, if the individual splits the $500,000 into deposits of $250,000 at two different banks, each deposit (and therefore the full $500,000) can be protected by FDIC insurance.

90.     A second such regulation governs requirements that must be met to pay interest on a deposit account.  Following legislation in 1982, banks were authorized to offer "money market deposit accounts" or "MMDAs," which are interest bearing accounts.   Unlike a traditional checking account or demand deposit account, MMDAs are subject to monthly restrictions on the number of times certain forms of withdrawals may be made.  At the time that

Defendants originally applied for the licensed patents, federal regulations restricted the payment of interest on accounts that were not subject to these withdrawal limits.

### E.    Defendants' licensed patent portfolio.

91.    In the 1990s, Double Rock (then Reserve) offered cash management services and products subject to federal regulations like those discussed above.

92.    On October 21, 1998—months after the Federal Circuit's *State Street Bank* decision—Bruce Bent Sr. and Bruce Bent II filed for their first application that led to the licensed patents, entitled "Money fund banking system."  The Background of this application, which issued as U.S. Patent No. 6,374,231 (the "'231 patent"), describes the regulatory limits on FDIC insurance and on withdrawals from interest-bearing accounts discussed above as the "State of the Art" for the invention.  *See* '231 patent at 1:9-63.

93.    The '231 patent's "Summary of the Invention" explains:  "In light of this regulatory scheme, it would be beneficial to provide depositors of demand accounts with interest from the funds on deposit while simultaneously providing unlimited (or at least six) transfers of the funds therein."  *Id.* at 1:64–2:2.

94.    Claim 1 of the '231 patent recites:

1. A method for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured money market deposit account, comprising:

providing a database having client information for each account;

administering clients' deposits to and withdrawals from each of their demand accounts;

authorizing or rejecting the use of funds in a particular client's demand account for each demand payment requested from that client's account;

determining the net transaction aggregated across all said demand account deposits and withdrawals on a regular periodic basis;

using the determination of the net transaction to deposit funds to or withdraw funds from said single insured money market deposit account;

distributing interest paid on said single money market deposit account to said clients' demand accounts; and

updating the database for each client's deposit and authorized demand payment.

95.     The Portfolio includes 58 patents the Bents were able to obtain relating to this basic idea.  Indeed, the Portfolio is subject to 36 terminal disclaimers (many to multiple patents within the Portfolio).

96.     All of the patents in the Portfolio claim fundamental economic and conventional business practices, and a number of them include reference to generic computing components for performing the underlying business method.

97.     In prosecuting an application related to the '231 patent, the Bents explained that "the systems and methods of the present invention manage client accounts for both liquidity and security, by permitting, *inter alia*, unlimited client withdrawals while retaining maximum FDIC insurance."  *See* Ex. 15 at 15.  In explaining their alleged invention to the Patent Office in that same application, the Bents noted that dividing an individual's deposits among accounts at multiple banks addressed regulatory restrictions:

The use of multiple FDIC-insured interest-bearing deposit accounts at other banks allows aggregations of demand account funds from the multiple retail customers to be distributed across a series of different banks in a controlled manner in order to avoid any one customer from accumulating more than $100,000 (the current FDIC insurance limit for an individual) in a given FDIC-insured and interest-bearing aggregate deposit account at a particular deposit account bank, thereby ensuring FDIC insurance for customer amounts over $100,000.

Additionally, the use of multiple FDIC-insured deposit accounts at multiple different banks provides the ability to avoid the 6 withdrawal limit for a month on a given FDIC-insured interest-bearing deposit account in a given bank that is imposed by banking regulations.

Ex. 16 at 79.

98.    During prosecution of another related patent in the Portfolio, U.S. Patent No. 7,668,771, the Bents similarly explained that:

> [t]he present invention is directed [to] a problem of minimizing withdrawal activity to comply with Regulation D, in the context of a system comprising multiple large "aggregated accounts," dispersed across a plurality of deposit institutions in a group, so as to maintain the interest-bearing status of these aggregated accounts while permitting more than 6 withdrawals from the underlying client transaction accounts that are the source of the aggregated account funds.

Ex. 17 at 38.   During the same prosecution, the Bents further explained "[i]n particular, the claimed method solves an issue relating to banking Regulation D restriction limiting pre-authorized withdrawals from an interest-bearing account to no more than 6 withdrawals in a month using certain withdrawal methods." *Id.*

99.    In prosecution, the Bents explained that the patents in the Portfolio address the banking regulatory problems arising from restrictions, such as in Regulation D, by using aggregated accounts at multiple banks.

100.    For example, in prosecuting U.S. Patent No. 7,752,129, the Bents addressed the restrictions on monthly withdrawals for interest-bearing accounts, explaining:  "The present invention relates to systems and methods for managing a plurality of interest-bearing transaction accounts for multiple clients so that the number of withdrawals during a month from the client transaction accounts is not necessarily limited." Ex. 18 at 57.

101.    In prosecuting U.S. Patent No. 8,311,939, the Bents addressed FDIC insurance limits, explaining: "The claimed operation provides the dual advantages of automatically spreading risk and providing capacity to facilitate the swapping out client excess amounts that are over the government insurance limit and swapping in funds of other clients to obtain the government backed insurance." Ex. 19 at 11.

102.    In prosecuting numerous patents in the Portfolio, including U.S. Patent Nos. 7,752,107, 7,668,771, 7,672,901, and 7,672,902, the Bents explained: "The present invention

relates to a method of managing a group of '*aggregated accounts*', such as a group of aggregated money market deposit accounts or an aggregated demand checking account." Ex. 20 at 14 (emphasis original); *see also* Ex. 21 at 22; Ex. 22 at 13; Ex. 23 at 8; Ex. 24 at 11; and Ex. 25 at 7.

103.    During prosecution of numerous patents in the Portfolio, the Bents explained the generic nature of a number of claim elements concerning the implementation of the claimed account management methods.

104.    For example, the Bents addressed claim elements directed to obtaining or receiving data or information in the prosecution of a number of patents. In connection with U.S. Patent No. 8,290,860, the Bents explained: "The means of obtaining the information is not limiting on the invention. In some embodiments, the information may be obtained from the one or more databases. In some embodiments, the information may be received or obtained from an external source." Ex. 26 at 17.

105.    In prosecuting U.S. Patent No. 8,019,668, the Bents similarly explained that the claim element "obtaining transfer data" could be done via a network, the web, telephone, fax, or mail and human data entry:

> A new element "obtaining transfer data" is now present in independent claims 24 and 33. The claim element comprises the operation of receiving data via a network, or receiving data by telephone or facsimile or by mail and keying that data into the computer, or accessing data on a website or other network connection, or calculating data, for funds to be added to the aggregated deposit accounts in the program or to be withdrawn from the aggregated deposit accounts in the program, or simply to be shifted between aggregated deposit accounts for various reasons, such as for insurance purposes, or to maintain stable funds, or to maintain maximum cap levels or minimum cap levels, to name a few.

Ex. 27 at 8.

106.    In connection with U.S. Patent No. 8,401,962, the Bents similarly explained: "The claim term '*receiving by one or more computers*' comprises receiving a data transmission,

or receiving a calculated amount from a calculation module, or receiving data via keying the data into a computer."  Ex. 28 at 8 (emphasis original).

107.    The Bents also addressed a claimed "communication component" in prosecuting a number of patents in the Portfolio.  In connection with U.S. Patent Nos. 8,355,985, 8,290,859, and 8,290,860, the Bents explained that the "communication component" of its claimed inventions could be implemented with a variety of types of portals: "Note that the claim element 'communication component' may be implemented with one communication portal or it may be implemented with a plurality of portals for different communication elements, such as an Internet portal, an email portal, a web-based portal, a cell phone or PDA portal, to name a few."  Ex. 29 at 12; Ex. 30 at 12; Ex. 31 at 16; Ex. 32 at 14; and Ex. 33 at 16.

108.    The Bents also addressed the claim term "determining" in prosecuting a number of patents in the Portfolio.  In prosecuting U.S. Patent Nos. 8,019,668, 8,019,667, and 8,401,962, the Bents explained that the claimed "determining" could be done in a variety of ways: "The term '*determining*' is to take its ordinary meaning to one or ordinary skill in the art as identifying or ascertaining, e.g., by looking up or retrieving from a table, a field in a database or data file, or calculating, which is the manner a computer would determine something." Ex. 27 at 9 (emphasis original); Ex. 28 at 8; and Ex. 34 at 16.

109.    The purported inventions claimed in the Portfolio relate to fundamental economic practices long prevalent in our system of commerce and amount to little more than methods of organizing human activity via contractual arrangements.

110.    The claims in the Portfolio recite business methods drawn to address regulatory requirements for banking and financial institutions.  The Portfolio claims add, at most, only generic computing components performing established and conventional functions (*e.g.*, performing calculations, receiving and transmitting data, accessing and updating a database) that are used merely as a tool to implement fundamental business practices.

**F.      Prior litigation between Defendants and a third party involving the Portfolio.**

111.    According to public records, the Defendants have been involved in prior litigation concerning patents in the Portfolio.   In the public record of these cases, the Defendants characterized their purported invention as a solution to regulatory challenges and characterized the purported point of novelty of their invention in financial terms rather than as a significant technological innovation.   Upon information and belief, Defendants have documents that are not publicly available, including documents filed under seal in their litigations, reiterating their public characterizations of their Portfolio as business method patents.

112.    For example, in litigation against Deutsche Bank and other companies filed in 2009, Defendants alleged:   "The '286 patent claims a novel method of managing client funds by providing financial institutions the ability to provide client accounts with increased FDIC insurance and provide interest using tiered interest rates.   The patented method also manages the accounts by aggregating the client accounts at each bank participating within the program." *Island Intellectual Property LLC, LIDs Capital, and Double Rock Corp. v. Deutsche Bank AG, et al.*,   Case No. 1:9-cv-02675 ¶ 16 (S.D.N.Y. Mar. 24, 2009).

113.    In litigation before this court against Institutional Deposits Corp. filed in 2011, Defendants alleged:   "The '821 patent generally claims novel and non-obvious systems and methods used with deposit sweep products which generally allow a source banking institution (like a bank or broker-dealer with an affiliated bank) to retain funds at one or more affiliated banks, but also allow for excess FDIC insurance for customers by using non-affiliated banks." *Island Intellectual Property LLC v. First Southwest Co*., C.A. No. 11-371 (RGA) (D.I. 1) ¶ 16 (D. Del. Apr. 26, 2011).

114.    In the litigation against Deutsche Bank, the question of patent eligible subject matter was addressed on the accused infringer's motion for summary judgment of invalidity of five of Defendants' patents on the ground that they were directed to ineligible subject matter. The court decided the motion in 2012—two years prior to the Supreme Court's *Alice* decision. In finding Deutsche Bank failed to meet its burden on summary judgment, the court compared

the challenged claims to those at issue in the Federal Circuit's decisions in (1) *Cybersource Corp v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) (finding claims at issue ineligible) and (2) *Ultramercial, Inc. v. Hulu LLC*, 657 F.3d 1323 (Fed. Cir. 2011) (finding claims at issue eligible).   The court found that "the patents in the instant action are more analogous to those in *Ultramercial* than to those in *Cybersource*" and cited the reasoning and holding of the *Ultramercial* decision repeatedly.   Upon information and belief, the Bents argued against the motion for summary judgment by taking the position that their patent claims were analogous to those in *Ultramercial*.

115.   After *Alice*, the Supreme Court vacated the *Ultramercial* ruling and remanded to the Federal Circuit for reconsideration.   On remand, the *Ultramercial* decision relied upon by the court in the Deutsche Bank case was reversed and the claims that the court likened to Island IP's were held to be directed to patent ineligible abstract ideas.   *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014).

### G.   Historical practices under FDIC and banking regulations.

116.   The claims in the Portfolio recite business methods drawn to address regulatory requirements for banking and financial institutions.   The Portfolio claims add, at most, only generic computing components performing established and conventional functions (*e.g.*, performing calculations, receiving and transmitting data, accessing and updating a database) that are used merely as a tool to implement fundamental business practices.

117.   As acknowledged in a number of the licensed patents, the financial services and banking industries had developed a variety of cash management accounting techniques and systems before the purported invention.

118.   For example, U.S. Patent No. 7,668,771 provides:

Securities brokerage cash management systems, such as the system disclosed in U.S. Pat. No. 4,774,663 to Musmanno et al. ("the Musmanno"), are useful in managing data processing and information between securities brokerage accounts, individual deposit accounts and deposit institutions.   The Musmanno, for example, discloses a system in

> which subscriber expenditures, such as charge card use, check and/or cash advances are applied on a hierarchical basis against the subscriber's free credit balance, short term investment and the lendable equity in the subscriber's securities account.  On a periodic basis, received card charges, check, securities and deposit transactions for the account participants are verified and employed to compute an updated credit limit for each subscriber.  Other accounting systems, such as the system disclosed in U.S. Pat. No. 5,893,078 to Paulson, are primarily directed to managing sweep transactions, in which a bank account sweeps any unused funds into a higher-interest earning account.

U.S. Patent No. 7,668,771 at 1:29-46.

119.    Additionally, U.S. Patent No. 7,509,286 and numerous other licensed patents explain:

> Banks and other savings institutions have developed several approaches, which include money-market mutual fund sweeps and re-purchase agreement ("repo") sweeps, offered by third parties in an effort to compete with those financial institutions, for example broker/dealers, who are able to offer interest on cash balances for all their customers including commercial customers by using money-market mutual funds.

*See, e.g.*, U.S. Patent Nos. 7,509,286, Certificate of Correction at 8; 7,536,350 at 2:13-25; 7,668,772 at 2:17-32; 7,668,772 at 2:33-42; 8,019,667 at 2:36-45; 8,260,697 at 2:39-48; 8,290,859 at 2:17-29; 8,290,860 at 2:15-27; 8,290,861 at 2:18-30; 8,355,985 at 2:17-29; 8,401,962 at 2:18-30; 8,498,933 at 2:16-28; 8,560,442 at 2:16-28; 8,566,200 at 2:39-48; 8,566,201 at 2:45-54; and 8,571,984 at 2:23-35.

120.    Consistent with the licensed patents' acknowledgements, public records from a number of governmental agencies describe a variety of established and historical practices in the banking and financial industry.

121.    Banks or other depository or financial institutions may seek guidance from agencies, such as the Federal Reserve, the FDIC, and the SEC, concerning how certain rules and regulations may apply to services or product offerings.  In response to such requests, since at least the early 1980s, the Federal Reserve, the FDIC, and the SEC have issued advisory opinions

or their equivalent.  Such opinions are available to the public as part of these agencies' records to provide guidance to not only the requester but to other interested parties in the industry.

122.    These opinions describe a variety of practices that have been well known and established in the banking and finance industry for decades.

123.    Such long-established practices include: (1) aggregating customer accounts to address regulatory limits; (2) allocating funds across multiple accounts and institutions to extend FDIC insurance beyond the limit for a single institution; and (3) managing the withdrawals from savings and MMDA accounts to maintain the ability to award interest under applicable laws and regulations.

124.    Aggregating customer accounts is a fundamental economic practice that has long been well known in the financial industry.  For instance, in 1975, the Securities and Exchange Commission discussed a product that involved aggregating the funds of unrelated customers into time deposit instruments (*i.e.*, certificates of deposit).  *See* Ex. 35.  Similar practices have been also used for MMDAs.  For example, in 1985 the Securities and Exchange Commission addressed a broker-dealer's plan to aggregate funds of unrelated customers into comingled MMDAs.  *See* Ex. 36.  Analogous plans have been described at length in numerous FDIC opinion letters.  *See, e.g.*, Exs. 37–40.

125.    Similarly, allocating funds across multiple accounts and institutions to diversify risk—including by extending FDIC insurance beyond the limit for a single institution—is a fundamental economic practice that has long been well known in the financial industry.  For example, in 1983, the Federal Reserve Board of Governors approved a plan by Merrill Lynch for dividing a customer's funds into $100,000 or less increments and then re-depositing each segment into separate deposit accounts so that all of the customer's funds would be FDIC-insured.  Ex. 41, *Board of Governors of the Federal Reserve System*, 1983 Fed. Res. Interp. Ltr. LEXIS 88 (June 22, 1983).  Under the plan, a customer "would direct Merrill Lynch, as agent and custodian for the customer, to establish an MMDA at one of the participating depository institutions."  *Id.* at 1.  For federal deposit insurance purposes, if the customer's funds exceeded

$100,000, then "additional MMDAs would be established at other depository institutions." *Id.* at 1. Meanwhile, each of the individual MMDAs would be "consolidated and under the control of Merrill Lynch." *Id.* at 3. Over the years, similar practices have been described in numerous Federal Reserve and FDIC opinion letters, a number of which involved aggregated customer funds. *See, e.g.*, Exs. 37–40 and 42–48.

126.   Additionally, administering transactions made from a customer's account so as to avoid exceeding the monthly number permitted by federal regulation for an account to bear interest is also a fundamental economic practice that has long been well known in the financial industry. For instance, in the plan described above in the 1983 Federal Reserve letter, Merrill Lynch proposed managing withdrawals from its customers' MMDAs. Notably, all withdrawals "[would] be effected by and through Merrill Lynch as agent and messenger for its customers" to ensure that the customer did not exceed the limits on the number of monthly transactions permitted under federal regulations for an account that pays interest. *See* Ex. 41. Similar practices have been described in numerous Federal Reserve and FDIC opinion letters. *See, e.g.*, Exs. 37–40 and 42–48.

### H.   The patents challenged in this action.

127.   In this complaint, Plaintiffs challenge the validity of the '668 patent; the '771 patent; the '382 patent; the '960 patent; the '321 patent; the '676 patent; the '716 patent; the '689 patent; and the '901 patent.

128.   In particular, the patents-in-suit simply implement fundamental business practices—such as allocating funds across accounts and updating accounting to reflect the allocations—to comply with FDIC insurance limits, at most using generic and conventional computing elements.

129.   Each of the patents-in-suit claim similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via

fundamental business methods (*e.g.*, in even amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

130.    Among others, claim 1 of the '668 patent is representative of the patents-in-suit. The '668 patent claims generally recite the steps of accessing a database with client accounting information (*e.g.*, where clients' funds are held and in what amount); allocating and transferring clients' funds to one or more accounts based on unspecified "rules"; and updating the database to record what was done (*i.e.*, bookkeeping).  These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g.*, by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable Federal regulations.  This ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

131.    Claim 1 of the '668 patent is reproduced in the chart below.  The chart highlights the generic computer elements used to implement the accounting and business practice steps to which the claims are directed, as described in the right column:

| Claim 1 of U.S. Patent No. 7 8,019,668 | Nature of the Alleged Invention |
|---|---|
| 1. A method, comprising: | Business Method:  Method for allocating client deposits |
| (A) accessing, using one or more computers, one or more databases comprising: | Accessing a database (with a computer) |
| (1) aggregated deposit account information for a plurality of government-backed insured and interest-bearing aggregated deposit accounts held in a plurality of deposit institutions, each of the respective deposit institutions holding one or more of the aggregated deposit accounts, each of the aggregated deposit accounts holding funds of a plurality of client accounts; and | Accounting information in the database |

| Claim 1 of U.S. Patent No. 7 8,019,668 | Nature of the Alleged Invention |
|---|---|
| (2) client account information for each of more than one of the respective client accounts, the client account information for a respective one of the client accounts comprising a respective balance of funds of the respective client account held in each of one or more of the government-backed insured and interest-bearing aggregated deposit accounts holding funds of the respective client account; and | |
| (B) determining, using the one or more computers, at least one aggregated deposit account in one of the deposit institutions to which to deposit/transfer or to withdraw/transfer funds, based at least in part on a selection rule to direct fund transfer activity to this one aggregated deposit account, and/or based at least in part on a selection rule to direct fund transfer activity away from one or more other of the respective aggregated deposit accounts;<br><br>(C) obtaining transfer data comprising an amount of funds comprising deposits/transfers to and/or withdrawals/transfers from one or more of the aggregated deposit accounts;<br><br>(D) allocating funds, using the one or more computers, to one or more of the aggregated deposit accounts held in one or more of the deposit institutions based on the transfer data and on one or more allocation rules;<br><br>(E) allocating, using the one or more computers, fund amounts of client accounts among the aggregated deposit accounts, to substantially match respective amounts allocated to the aggregated deposit accounts based on the transfer data and the one or more allocation rules; | Allocating and transferring client funds among accounts based on unspecified "rules" and account activity (with a computer) |

| Claim 1 of U.S. Patent No. 7 8,019,668 | Nature of the Alleged Invention |
|---|---|
| (F) generating and communicating data for one or more instructions, using the one or more computers and a network communication link, to transfer funds to or from the at least one aggregated deposit account based at least in part on one or more of the allocating steps; and | |
| (G) updating, using the one or more computers, the one or more databases with information based at least in part on one or more of the allocating steps. | Updating the books kept in the database to record where the client funds were allocated (with a computer) |

132.    The other independent claims of the '668 patent are substantially the same as claim 1.  For example, claim 10 recites the system for allocating funds from an aggregated deposit account in an amount that matches respective amounts allocated to other deposit accounts using the same central steps as the method of claim 1.

133.    The dependent claims of the '668 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter.  For example, the dependent claims of the '668 patent add elements such as determining if a deposit/transfer of funds is before or after a cutoff time (claim 2) or selecting an account based on whether it has been assigned a no-withdrawal designation (claim 9), all of which are basic accounting and fundamental business practices.

134.    The claims of the other patents-in-suit are directed to the same or similar accounting and business practices with minor variations that add no transformative inventive concept.

135.    The independent claims of the '771 patent simply add that data on client deposits and withdrawals is accessed and net transactions for aggregated accounts are determined for a "sub-period of time" (*e.g.*, hours, days, weeks) and that the allocation and transfer of funds among aggregated accounts considers whether certain banks have "no-withdrawal" designations. These additions do not introduce an inventive concept on their own or in combination; they

merely specify accounting practices implemented with a generic computer. The dependent claims of the '771 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter. For example, the dependent claims of the '771 patent add elements such as selecting banks for transactions by using unspecified rules (claim 18) or allocating funds by approving net transaction activity information (claim 23), all of which are basic accounting and fundamental business practices.

136. The independent claims of the '382 patent simply add that transfer data is obtained "via an internet interface," that funds are not withdrawn from a subset of aggregated accounts based on some unspecified "criteria," and that a report of the fund allocations is generated. These additions do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer and "internet interface." The dependent claims of the '382 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter. For example, the dependent claims of the '382 patent add elements such as receiving transfer data from a person over an internet interface (claim 8) or receiving transfer data through a savings institution (claim 10), all of which are basic accounting and fundamental business practices.

137. The independent claims of the '960 patent simply add that a minimum or maximum fund cap for an institution is adjusted based on its capital usage and that the allocation of funds among institutions is based at least on the institutions fund cap. These additions do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer. The dependent claims of the '960 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter. For example, the dependent claims of the '960 patent add elements such as receiving transfer data through an investment advisor (claim 15) or using a generic computer to change the minimum cap or maximum cap (18), all of which are basic accounting and fundamental business practices.

138.    The independent claim of the '321 patent simply adds that the allocation of funds avoids withdraws from a subset of the aggregated accounts based on some unspecified "criteria" for a unspecified "sub-period of time" and that a report of the fund allocations is generated These additions do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.   The dependent claims of the '321 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter.   For example, the dependent claims of the '321 patent add elements such as obtaining a source institution's approval for an allocation (claim 5) or using a credit union as one of the depository institutions (claim 9), all of which are basic accounting and fundamental business practices.

139.    The independent claims of the '676 patent simply add that funds are held in an operating account of an intermediary bank before distribution to the aggregated accounts and that the amount of funds attributed to a client in an account is changed to stay below a specified amount.   These additions do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.   The dependent claims of the '676 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter.   For example, the dependent claims of the '676 patent add elements such as obtaining client transaction data in the form of a sweep file (claim 5) or monitoring the control operating account at least on an hourly basis (claim 6), all of which are basic accounting and fundamental business practices.

140.    The independent claims of the '716 patent are substantially identical to those of the '676 patent.   These claims do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer. The dependent claims of the '716 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter.   For example, the dependent claims of the '716 patent add elements such as monitoring the control operating account at least

on an hourly basis (claim 2) or determining which client accounts are eligible for fund allocation (claim 3), all of which are basic accounting and fundamental business practices.

141.    The independent claims of the '689 patent simply add that the total funds in each aggregated account is determined by adding the total funds held in the account by clients in three "stratifications" (a high, middle, and low "stratification" that clients fall within depending on their balance in the program), that these totals are compared to capacity caps for each aggregated account, and that, based on any excess capacities, an account parameter is modified (*e.g.*, number of client accounts, amount of account funds, capacity cap, number of deposit institutions).  These additions do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '689 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter.  For example, the dependent claims of the '689 patent add elements such as making the transfer data based on allocations accessible (claim 6) or each stratification may be measured in accordance with its respective balance (claim 12), all of which are basic accounting and fundamental business practices.

142.    The independent claims of the '901 patent simply add that account transfers and net amounts are determined for "a sub-period of time" and that a holdback amount is obtained that may be used to satisfy a net transaction after a cutoff time.  These additions do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '901 patent also fail to add any limitations that might transform the claimed accounting method into patent eligible subject matter.  For example, the dependent claims of the '901 patent add elements such as a negative net transaction amount (claim 2) or using a computer to receive the holdback amount (claim 4), all of which are basic accounting and fundamental business practices.

143.    Like the claims of the '668 patent, the claims of all the patents-in-suit in this case, are each directed to the same basic accounting and business practices implemented with generic and conventional computing elements.    These generic and conventional computer

implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent eligible invention.

## COUNT I

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 7,668,771

144.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

145.    A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

146.    For at least the reasons alleged above, the '771 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

147.    The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

148.    Further, for example, the claims of the '771 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '771 patent.  The claims of the '771 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '771 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

149.    Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '771 patent are invalid.

## COUNT II

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 7,672,901

150.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

151.    A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

152.    For at least the reasons alleged above, the '901 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

153.    The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

154.    Further, for example, the claims of the '901 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '901 patent.  The claims of the '901 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '901 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

155.    Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '901 patent are invalid.

## COUNT III

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 7,680,716

156.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

157.    A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

158.    For at least the reasons alleged above, the '716 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

159.    The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

160.    Further, for example, the claims of the '716 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '716 patent.  The claims of the '716 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '716 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

161.    Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '716 patent are invalid.

## COUNT IV

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 8,019,668

162.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

163.    A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

164.    For at least the reasons alleged above, the '668 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

165.    The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

166.    Further, for example, the claims of the '668 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '668 patent.  The claims of the '668 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '668 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

167.    Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '668 patent are invalid.

## COUNT V

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 8,239,321

168.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

169.    A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

170.    For at least the reasons alleged above, the '321 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

171.    The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

172.    Further, for example, the claims of the '321 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '321 patent.  The claims of the '321 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '321 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

173.    Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '321 patent are invalid.

**COUNT VI**

**Declaratory Judgment of Patent Invalidity of U.S. Patent No. 8,386,382**

174.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

175.    A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

176.    For at least the reasons alleged above, the '382 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

177.    The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

178.    Further, for example, the claims of the '382 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '382 patent.  The claims of the '382 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '382 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

179.    Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '382 patent are invalid.

## COUNT VII

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 8,571,960

180.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

181.    A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

182.    For at least the reasons alleged above, the '960 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

183.    The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

184.    Further, for example, the claims of the '960 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '960 patent.  The claims of the '960 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '960 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

185.    Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '960 patent are invalid.

## COUNT VIII

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 8,606,676

186.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

187.   A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

188.   For at least the reasons alleged above, the '676 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

189.   The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

190.   Further, for example, the claims of the '676 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '676 patent.  The claims of the '676 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '676 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

191.   Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '676 patent are invalid.

## COUNT IX

### Declaratory Judgment of Patent Invalidity of U.S. Patent No. 8,655,689

192.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

193.   A concrete and immediate controversy has arisen between the parties regarding Plaintiffs' obligation, if any, to pay Defendants for rights in the patent.

194.   For at least the reasons alleged above, the '689 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of §§ 101, 102, 103, and 112.

195.   The claims are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

196.   Further, for example, the claims of the '689 patent are anticipated by at least the Merrill Lynch system discussed above and/or rendered obvious by the Merrill Lynch system in view of the knowledge of persons of ordinary skill in the art.  Such knowledge is evidenced by, for example, the FDIC, Federal Reserve, and SEC opinions and decisions discussed above.  The Merrill Lynch system was sold, offered for sale, and in public use well before the earliest priority date of the '689 patent.  The claims of the '689 patent recite basic accounting and business practices that were included in at least the Merrill Lynch system and/or were well known to those of ordinary skill in the art.  Those practices are implemented in the '689 patent's claims in a predictable way to address well-understood regulatory requirements as discussed above.

197.   Plaintiffs seek and are entitled to a declaratory judgment that, under the Patent Laws of the United States, including the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), Plaintiffs are entitled to challenge the validity of the licensed patents, that any contractual

provisions purporting to limit that right or to require the payment of royalties during such challenge are unenforceable, and that all claims in the '689 patent are invalid.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter judgment in its favor and against Defendants as follows:

1.    That Plaintiffs are entitled to the protections of the *Lear* Doctrine and are not prohibited from challenging the patents-in-suit;

2.    That the licensed patents and each of their claims are invalid;

3.    Awarding Plaintiffs costs incurred in connection with this action; and

4.    For such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

OF COUNSEL:

Michael C. Hendershot
Yar R. Chaikovsky
Lindsay M. White
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
(650) 320-1800

Bruce M. Wexler
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

November 23, 2016

Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Plaintiffs Reich & Tang Deposit Solutions, LLC and Reich & Tang Asset Management, LLC*